IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**ISAAC I. FRIDAY,**

    **Plaintiff,**

v.                                                                    No. CIV-14-1110 LAM

**CAROLYN W. COLVIN, Acting Commissioner**
**of the Social Security Administration,**

    **Defendant.**

# MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Plaintiff's *Motion to Reverse and Remand to Agency for Rehearing, With Supporting Memorandum (Doc. 21)*, filed May 20, 2015 (hereinafter "motion"). On August 14, 2015, Defendant filed a response to Plaintiff's motion to reverse or remand [*Doc. 25*], and, on September 1, 2015, Defendant filed a reply [*Doc. 26*]. In accordance with 28 U.S.C. § 636(c)(1) and Fed. R. Civ. P. 73(b), the parties have consented to the undersigned United States Magistrate Judge to conduct all proceedings and enter a final judgment in this case. *See* [*Docs. 4* and *6*]. The Court has considered Plaintiff's motion, Defendant's response, Plaintiff's reply, and the relevant law. Additionally, the Court has meticulously reviewed and considered the entire administrative record. [*Doc. 14*]. For the reasons set forth below, the Court **FINDS** that Plaintiff's motion should be **GRANTED** and the decision of the Commissioner of the Social Security (hereinafter "Commissioner") should be **REMANDED**.

# I. Procedural History

On September 30, 2010, Plaintiff filed applications for Disability Insurance Benefits (hereinafter "DIB") and Supplemental Security Income (hereinafter "SSI"), alleging that he became disabled on April 19, 2006. [*Doc. 14-7* at 2-8 and 9-14, respectively]. Plaintiff stated that he became disabled due to Post Traumatic Stress Disorder ("PTSD"); major depression; bipolar; agoraphobia; panic attacks; bilateral pain in both feet ankles and knees; and back pain. [*Doc. 14-8* at 15]. Each application was denied at the initial level on May 19, 2011 (*Doc. 14-4* at 2-3 and 4, respectively), and at the reconsideration level on April 20, 2010 (*id.* at 5-14 and 15-24, respectively). Pursuant to Plaintiff's request (*Doc. 14-5* at 12-13), Administrative Law Judge J. Dell Gordon (hereinafter "ALJ") conducted a video hearing on January 24, 2013. [*Doc. 14-3* at 45-65]. At the hearing, Plaintiff was present, represented by a non-attorney representative, and testified (*id.* at 47 and 49-59). Vocational Expert Margaret Kelsey (hereinafter "VE") was also present and testified (*id.* at 47 and 62-66).

On March 29, 2013, the ALJ issued his decision, finding that, under the relevant sections of the Social Security Act, Plaintiff was not disabled through the date of the decision. [*Doc. 14-3* at 31-43]. Plaintiff requested that the Appeals Council review the ALJ's decision (*id.* at 29), which request was granted on September 17, 2014 (*id.* at 15-18), and on October 27, 2014, the Appeals Council issued a partially favorable decision (*id*. at 2-9), finding that Plaintiff had effectively reached "advanced age" as of January 19, 2013 and, therefore, was disabled as of that date, but not before. *Id*. at 8. However, the Appeals Council denied disability insurance benefits, as Plaintiff had only met the insured status requirements through March 31, 2009. *Id*.

at 7.  This decision was the final decision of the Commissioner.[1]  On December 8, 2014, Plaintiff filed his complaint in this case.  [*Doc. 1*].

## II.   Standard of Review

The standard of review in a Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether the correct legal standards were applied. *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008) (citing *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992)).  If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands, and the plaintiff is not entitled to relief.  *See Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).  Courts should meticulously review the entire record but should neither re-weigh the evidence nor substitute its judgment for that of the Commissioner.  *Hamlin*, 365 F.3d at 1214; *Langley*, 373 F.3d at 1118.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Langley*, 373 F.3d at 1118 (citation and quotation marks omitted); *Hamlin*, 365 F.3d at 1214 (citation and quotation marks omitted); *Doyal*, 331 F.3d at 760 (citation and quotation marks omitted).  An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it."  *Langley*, 373 F.3d at 1118 (citation and quotation marks omitted);

---

[1] Neither Plaintiff nor Defendant addressed in their briefs the impact of the Appeals Council's decision, which did not alter either the effect of the ALJ's decision or his findings, except to the extent that it disagreed with the ALJ's decision that Plaintiff was not disabled up to the date of the hearing.  The Appeals Council's decision was based entirely upon Plaintiff's age of nearly 55 as of January 18, 2013.  *See* [*Doc. 14-3* at 6-7] (citing Rules 202.04 and 202.06 of 20 C.F.R. § 404, Appx. 2, Subpt. P, Table No. 2).  As the Appeals Council altered the ALJ's decision only as to what was effectively an issue of law, and as neither party has challenged that determination, the Court will limit its review to the ALJ's decision.

*Hamlin*, 365 F.3d at 1214 (citation and quotation marks omitted). While a court may not re-weigh the evidence or try the issues *de novo*, its examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005) (citations omitted). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ]'s findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

### III. Applicable Law and Sequential Evaluation Process

For purposes of DIB and SSI, a person establishes a disability when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 405.1505(a), 416.905(a). In light of this definition for disability, a five-step sequential evaluation process (hereinafter "SEP") has been established for evaluating a disability claim. 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the SEP, the claimant has the burden to show that: (1) the claimant is not engaged in "substantial gainful activity;" and (2) the claimant has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; and either (3) the claimant's impairment(s) either meet(s) or equal(s) one of the "Listings" of presumptively disabling impairments; or (4) the claimant is unable to perform his "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(i–iv), 416.920(a)(4)(i–iv); *Grogan*, 399 F.3d at 1261. At the fifth step of the evaluation process, the burden of proof shifts to the

Commissioner to show that the claimant is able to perform other work in the national economy, considering his residual functional capacity (hereinafter "RFC"), age, education, and work experience. *Grogan*, 399 F.3d at 1261.

## IV. Plaintiff's Age, Education, Work Experience, and Medical History; and the ALJ's Decision

Plaintiff was born on April 19, 1958. [*Doc. 14-8* at 10]. Plaintiff has held the following jobs: day laborer, painter, sales clerk, and warehouse worker. *Id* at 16. Plaintiff alleges that he is unable to work because of PTSD; major depression; bipolar disorder; agoraphobia; panic attacks; bilateral pain in both feet, ankles and knees; and back pain. *Id.* at 15. Plaintiff's medical records include: a Psychiatric/Psychological Impairment Questionnaire, dated December 21, 2011, by Arthur Panaro, MA, LPCC and Russell Brown, M.D., Ph.D. (*Doc. 14-38* at 10-18); a Medical Source Statement - Mental, dated June 30, 2011, by Arthur Panaro, MA, LPCC and Russell Brown, M.D., Ph.D. (*Doc. 14-39* at 2-46); treatment records from Life Link: dated April 5, 2011 to August 11, 2011 (*Doc. 14-33* at 44-59), September 14, 2010 to March 28, 2011 (*Doc. 14-32* at 39-59), and October 13, 2011 to March 27, 2013 (*Doc. 14-41* at 2-26); a Physical RFC Assessment, dated April 21, 2011, from DDS, Albuquerque (*Doc. 14-33* at 2-11); a Mental RFC Assessment, dated May 18, 2011, from DDS, Albuquerque (*id*. at 26-29); a Consultative Examination Report - Mental Status, dated March 22, 2013, by Michael F. Gzaskow, M.D. (*Doc. 14-32* at 33-38); and medical and hospital records from the Veteran's Administration ("VA") dated: April 3, 2006 to August 27, 2008 (*Doc. 14-9* at 2 through *Doc. 14-16* at 39); January 10, 2007 to August 28, 2008 (*Doc. 14-17* at 2 through *Doc. 14-31* at 32); December 6, 2010 to February 23, 2011 (*Doc. 14-32* at 2-32); November 9, 2011 to March 13, 2014 (*Doc. 14-42* at 2-51); November 19, 2013 to February 25, 2014 (*Doc. 14-43* at 2-51); February 25, 2013 to November 19, 2013 (*Doc. 14-44* at 2-51); February 29, 2012 to

5

February 25, 2013 (*Doc. 14-45* at 2-51); October 12, 2011 to February 27, 2012 (*Doc. 14-46* at 2-51); and April 18, 2011 to February 21, 2014 (*Doc. 14-47* at 2-23). Where relevant, Plaintiff's medical records are discussed in more detail below.

At step one of the five-step evaluation process the ALJ found that Plaintiff has not engaged in substantial gainful activity since his amended alleged disability onset date of March 31, 2009. [*Doc. 14-3* at 36]. At step two, the ALJ found that Plaintiff has the following severe medically determinable impairments: contracture deformity left foot hallux extensor; left foot middle joint arthritis and hammertoe deformity; osteoarthritis bilateral knees; degenerative disc disease of lumbar and cervical spinal region; left ankle fracture requiring open reduction internal fixation ("ORIF"); PTSD; major depressive disorder with features of obsessive compulsive disorder; panic disorder with agoraphobia; dissociative disorder; and history of alcohol and substance abuse in long-term remission. *Id.* at 36-37. At the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the Listings found in 20 C.F.R. § 404, Subpt. P, Appx. 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). *Id.* at 37. In so finding, the ALJ also found that Plaintiff's psychiatric impairments impose mild restrictions of his activities of daily living (hereinafter "ADLs"); moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and Plaintiff has had no repeated episodes of decompensation of extended duration. *Id.* The ALJ therefore concluded that Plaintiff had not satisfied either the Paragraph B or C criteria. *Id.* Before step four, the ALJ determined that Plaintiff had the RFC[2] to perform "a wide range [of] light work as defined in 20 C.F.R.

---

[2] The Court notes that the ALJ's decision occasionally inaccurately uses the pronoun "her," in reference to Plaintiff, and that one full paragraph of the decision quite obviously relates to a female claimant with entirely different disabilities than those of the Plaintiff, Mr. Friday. *See* [*Doc. 14-3* at 38]. In addition, the heading of Paragraph 6 of
Continued...

404.1567(b) and 416.967(b).   Specifically, for no period of 12 continuous month[s] has [Plaintiff] been preclude[d] from lifting, carrying, pushing, and pulling 10 pounds frequently and 20 pounds occasionally; standing and/or walking 6 hours in an 8-hour work day; sitting 6 to 8 hours in an 8-hour work day; frequently grasping, feeling, twisting, turning, reaching, and working overhead; frequently stooping and balancing, and occasionally kneeling, crouching, and crawling.   He must avoid concentrated exposure to hazards.   He can understand, remember, and carry out simple job instructions and tasks and make simple decisions; adequately make adaptations to working environments and adequately deal with changes in work processes and environment; and adequately relate to and interact with co-workers and supervisors, but cannot interact with and relate[] to the general-public." [*Doc. 14-3* at 37-38].   In support of the RFC finding, the ALJ stated that the December 2011 Impairment Questionnaire and the January 2013 Medical Source Statement, each of which was signed by both Mr. Panaro and Dr. Brown, were found not "to be well-supported by treating psychiatrist's own contemporaneous medical psychiatric treatment notes and psychiatric reports and the other medically acceptable clinical and laboratory diagnostic techniques in the hearing and/or to be consistent with other substantial evidence of record." *Id*. at 38-39.   However, the ALJ gave "great weight to the specific opinions of the State agency examiners who considered this issue at the initial and reconsideration levels of administrative review."  *Id*. at 42 (referring to Exs. 7F (*Doc. 14-33* at 2-11), 8F (*id*. at 12-25), 9F (*id*. at 26-29), and 10F (*id*. at 30-43)).

---

the ALJ's findings and conclusions states that "[t]he claimant *is able* to perform his past relevant work" (emphasis added), then states in the following paragraph that the ALJ "is convinced that the demands and requirements of the claimant's past relevant work exceed his residual functional capacity."  *Id*. at 42.   Although these mistakes do not significantly affect the substance of the ALJ's decision, they do render it with an aura of inaccuracy.

At the fifth and final step, the ALJ noted that Plaintiff was born on April 19, 1958 and was 48 years old "on the alleged disability onset date."[3]  [*Doc. 14-3* at 42].  The ALJ noted that Plaintiff has at least a high school education, and is able to communicate in English, and stated that "[t]ransferability of job skills is not an issue because [Plaintiff] does not have past relevant work." *Id.* (citing 20 C.F.R. §§ 404.1568 and 416.968).   The ALJ determined that, considering Plaintiff's age, education, work experience, and RFC, jobs exist in significant numbers in the national economy that Plaintiff can perform.  *Id.*   The ALJ stated that he asked the VE "whether jobs exist in the national economy for an individual with [Plaintiff's] age, education, work experience, and [RFC]," and the VE testified that such an individual "would be able to perform the requirements of the following representative unskilled, light jobs:" small parts assembler, motel cleaner, and price marker.  *Id.* at 43.  The ALJ stated that he "ha[d] determined that the [VE]'s testimony is consistent with the information contained in the Dictionary of Occupational Titles" (*id.*), and concluded that "[Plaintiff] is capable of making a successful adjustment to other work that exists in significant numbers in the national economy."  *Id.*   The ALJ, therefore, determined that Plaintiff was not disabled within the meaning of the Social Security Act.  *Id.*

## V.   Analysis

Plaintiff makes the following arguments in his motion to reverse or remand: (1) that the ALJ failed to properly evaluate the opinions of Dr. Gzaskow (*Doc 21* at 5-7); (2) that the ALJ's RFC finding fails to satisfy Soc. Sec. Rep. 96-8p because it did not include the required narrative (*id*. at 7-8); (3) that the ALJ failed to follow the treating physician rule with respect to the opinions of Arthur Panaro (*id*. at 8-11); and (4) that the ALJ relied on VE testimony that was inconsistent

---

[3] Plaintiff's original alleged onset date was April 19, 2006, which was his 48th birthday.  However, Plaintiff amended the onset date to March 30, 2009 at the hearing before the ALJ (*see Doc. 14-3* at 34 and 60), and the amended date was just 20 days prior to Plaintiff's 51st birthday.

8

with the Dictionary of Occupational Titles ("DOT"), in violation of SSR 00-4p (*id*. at 11-13).   In response, Defendant contends that the ALJ did provide a narrative of his RFC findings, that failure to consider Dr. Gzaskow's report was harmless error because Dr. Gzaskow's opinions were ultimately consistent with the ALJ's findings, that the ALJ properly evaluated the medical opinions, and that the Plaintiff's RFC does not include limitations that conflict with the jobs he was found able to perform.   [*Doc. 25* at 3-10].

### A.   The ALJ's Consideration of the Opinions of Dr. Gzaskow

Plaintiff first contends that the ALJ failed to evaluate the opinions of Dr. Gzaskow, a psychiatrist who performed a Consultative Exam ("CE") of Plaintiff on March 22, 2011. [*Doc. 21* at 5].   Defendant, however, contends that the ALJ's failure to discuss Dr. Gzaskow's CE was "harmless error."   [*Doc. 25* at 5-7].   Defendant states that "[s]ince the ALJ's findings were ultimately consistent with Dr. Gzaskow's opinions," the ALJ's failure to weigh that opinion was harmless because "there was 'no reason to believe that a further analysis or weighing of this opinion could advance [Plaintiff's] claim of disability.'"   *Id*. at 6 (citing *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1163 (10th Cir. 2012)).

The ALJ must base the RFC assessment on all of the relevant evidence in the record, such as medical history, laboratory findings, effects of treatment and symptoms, including pain, reports of daily activities, lay evidence, recorded observations, medical source statements, evidence from attempts to work, need for a structured living environment, and work evaluations, if any. Soc. Sec. Rep. 96-8p at *5.   "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."   *Id*. at *7.   The ALJ "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were

9

considered and resolved," and the RFC assessment must always consider and address medical source opinions. *Id*. Because the ALJ must consider the whole record, he is prohibited from picking and choosing "among medical reports, using portions of evidence favorable to his position while ignoring other evidence." *Carpenter v. Astrue*, 537 F.3d 1264, 1265 (10th Cir. 2008) (citation and internal quotation marks omitted). When there are multiple opinions regarding medical severity and functional ability from different sources, the ALJ must explain the weight given to each source's opinions. *Hamlin*, 365 F.3d at 1215 (citation omitted).

The Court finds that the ALJ's failure to either accept or reject Dr. Gzaskow's report, or to state his reasons for the acceptance or rejection of it, is legal error. Moreover, Defendant's characterization of Dr. Gzaskow's report as "ultimately consistent with the ALJ's findings," and therefore its omission as "harmless error" (*see Doc. 25* at 5-6), is an impermissible *post hoc* rationalization. *See Robinson v. Barnhart,* 366 F.3d 1078, 1084 (10th Cir. 2004) (explaining that reviewing courts may only evaluate an ALJ's decision "based solely on the reasons stated in the decision," and that it would be improper for a reviewing court or the Commissioner to "supply[] possible reasons" for an ALJ's decision after the fact) (citation omitted). If the ALJ considered Dr. Gzaskow's opinions to be "consistent" with his ruling, he should have detailed that consistency in his decision. As Defendant admits (*id*. at 5), however, he did not.

Dr. Gzaskow evaluated Plaintiff on March 22, 2011 and listed the following mental impairments: PTSD secondary to childhood trauma and prison/incarceration, depression disorder, not otherwise specified (NOS), alcohol abuse/dependence in full remission, and cannabis and cocaine abuse in full remission. [*Doc. 14-32* at 37]. Dr. Gzaskow further indicated his opinion that Plaintiff "can relate to others, but this is often compromised by his depressive isolation/withdrawal and PTSD symptomology," and that Plaintiff "can attend to simple tasks."

10

*Id.* Dr. Gzaskow's report should have been considered and discussed by the ALJ, particularly with respect to his opinions that Plaintiff's ability to relate to others can be compromised and that he could only attend to simple tasks. *Id.* In fact, however, a significant majority of the ALJ's determination of Plaintiff's RFC consists of his discussion of Plaintiff's physical complaints. *See* [*Doc. 14-3* at 6-8]. The ALJ did not discuss whether or not Plaintiff's ability to relate to others or his ability to attend to simple tasks impacted the RFC determination, although 20 C.F.R. §§ 404.1545(c) and 416.945(c) specifically provide that "a limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce [a claimant's] ability to do past work and other work." Thus, the ALJ's failure to discuss Dr.Gzaskow's opinions regarding Plaintiff's ability to relate to others or to attend to more than simple tasks is a significant omission.

### B. The ALJ's RFC Narrative and Consideration of the Opinions of Mr. Panaro[4]

Plaintiff also contends that the ALJ failed to properly evaluate the opinions of Plaintiff's treating therapist, Arthur Panaro, in determining Plaintiff's RFC and, in doing so, failed to provide a proper narrative in support of his RFC determination. [*Doc. 21* at 7-11]. As already noted, the ALJ must base the RFC assessment on all of the relevant evidence in the record, and must include a narrative discussion describing how the evidence supports each conclusion. Soc. Sec. Rep. 96-8p at *5-7. The ALJ "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved," and the RFC

---

[4] The Medical Source Statements submitted by Mr. Panaro were also signed by Dr. Michael Brown, M.D., Ph.D., an acceptable medical source. *See* [*Doc. 14-38* at 10-17]. However, it is not clear whether Dr. Brown signed these documents as Plaintiff's treating physician, or simply signed off as Mr. Panaro's supervisor. It appears that the ALJ considered the Panaro/Brown Medical Source Statements to be from a treating physician, as he more than once referred to them as being from Plaintiff's "treating psychiatrist." *See, e.g*, [*Doc. 14-3* at 42].

11

assessment must always consider and address medical source opinions.  *Id*.  Because the ALJ must consider the whole record, he is prohibited from picking and choosing "among medical reports, using portions of evidence favorable to his position while ignoring other evidence." *Carpenter*, 537 F.3d at 1265 (citation and internal quotation marks omitted).  When there are multiple opinions regarding medical severity and functional ability from different sources, the ALJ must explain the weight given to each source's opinions.  *Hamlin*, 365 F.3d at 1215 (citation omitted).

Here, the ALJ devoted only one paragraph of his RFC assessment to the medical evidence of Plaintiff's mental impairments.  *See* [*Doc. 14-3* at 40-41].  In that paragraph, the ALJ states that, "[c]ontrary to the treating psychiatrist's March 2011 and June 2012 assessment/opinions[5] that [Plaintiff] suffers prolonged acute psychiatric symptoms resulting in marked to extreme restrictions and limitations of functions, the contemporaneous psychiatric treatment notes, psychiatric reports, and other objective [sic] does not confirm symptoms and restrictions and limitation of such severity and intensity."  *Id*.  This conclusory statement fails to satisfy the requirement that the ALJ must adequately explain why a treating physician's opinion is not given deference, even when the opinion is found to not be entitled to controlling weight.  *See* Soc Sec. Rep. 96-2p, 1996 WL 374188, at *4 (explaining that "[i]n many cases, a treating source's

---

[5] The Court notes that there appear to be no such reports by Plaintiff's "treating psychiatrist" in the transcript provided.  Although Dr. Gzaskow's report is dated March 22, 2011, he was not Plaintiff's "treating psychiatrist." Moreover, when the ALJ used the term "treating psychiatrist" elsewhere in his decision it appears to be a reference to Mr. Panaro and/or Dr. Brown.  Thus, the ALJ subsequently found that "the treating psychiatrist's December 2011 and January 2013 assessments/opinions are not entitled to controlling or significant weight," referencing exhibits 11F (*Doc. 14-33* at 44-59) and 13F (*Doc. 14-38* at 10-18).  *See* [*Doc. 14-3* at 42].  Exhibit 11F consists of a series of office treatment records from The Life Link, which is where Plaintiff was seen by Mr. Panaro, among others, and does not contain either a December 2011 or a January 2013 opinion or assessment.  Exhibit 13F is a medical report/general impairment questionnaire prepared by Mr. Panaro and signed by him and Dr. Brown in December 2011, and a Panaro/Brown mental medical source statement dated January 22, 2013 is included within exhibit 14F.  *See* [*Doc. 14-39* at 2-7].  Thus, this Court concludes that it was actually the Life Link opinions/assessments in Exhibits 13F and 14F to which the ALJ assigned no controlling or significant weight.

medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight"); *see also Robinson*, 366 F.3d at 1082 (explaining that an ALJ must give good reasons for the weight assigned to a treating physician's opinion so that a subsequent reviewer can clearly analyze the appropriateness of the weight). In support of his position, the ALJ noted that, "since March 2009, [Plaintiff] is not shown to have sought or required [treatment for] any acute episodes requiring inpatient admissions, emergency room treatments, or other crisis treatments," and that he had maintained good attendance and compliance with psychiatric treatment, and had been described by "other treating and evaluating physicians" as "appropriately groomed and dressed, cooperative, friendly, alert, without acute distress and exhibiting good overall thought processes, moods, intellectual functioning, memory, and concentration." *Id*. The ALJ also relied on what he characterized as Plaintiff's own report that "subsequent to 2009 his most significant psychiatric condition has been depression, but that his psychiatric impairments do not impact his ability to secure and maintain substantial gainful employment," referencing pages 48-49 of exhibit 12F.[6] *Id*. at 41. In fact, the referenced medical records do not support the ALJ's attribution of that statement to Plaintiff. *See* [*Doc. 14-34* at 49 and *Doc. 14-35* at 2]. Rather, those pages simply document the opinion of Shelley S. Leiphart, a Veteran's Administration clinical psychologist, on August 15, 2011, that Plaintiff's depression (which she did not challenge) did not arise from the foot injuries he had received in connection with his military service. *Id*. In her assessment, Ms. Leiphart did make the statement that "[Plaintiff]'s claimed depression does not appear to impact his ability to secure or maintain substantially gainful employment," followed by a brief summary of Plaintiff's *pre-incarceration*

---

[6] Exhibit 12F consists of nearly 200 pages of hospital records from the Veteran's Administration from a period from February through August of 2011.

13

employment. [*Doc. 14-34* at 49]. However, there is no indication by Ms. Leiphart that Plaintiff had himself made such a statement.

The ALJ summarily states that he gave "great weight to the specific opinions of the State agency examiners who considered [Plaintiff's claim of totally disabling health impairments] at the initial and reconsideration levels of administrative review," citing exhibits 7F, 8F, 9F, and 10F.[7] [*Doc. 14-3* at 42]. Only exhibits 9F and 10F, which are a mental RFC assessment and psychiatric review technique, respectively, relate to Plaintiff's mental impairments. Both are dated May 18, 2011 and are signed by Donald Gucker, Ph.D.[8] As did Plaintiff's treating physicians and therapists, Dr. Gucker indicated that Plaintiff's mental disorders included Depression NOS, PTSD secondary to childhood trauma and incarceration, and alcohol and substance abuse in remission. *See* [*Doc. 14-33* at 33, 35, and 38]. He also indicated that these mental disorders caused Plaintiff mild restriction of activities of daily living, and moderate difficulties in maintaining social functioning and concentration, persistence, or pace, and that he had insufficient evidence to rate Plaintiff's episodes of decompensation.. *Id.* at 40. In his mental RFC assessment of Plaintiff, Dr. Gucker marked every function either "not significantly limited" or "moderately limited." *Id.* at 26-27.

Plaintiff's treating therapist, who had been treating Plaintiff for more than a year, provided in a psychiatric/psychological impairment questionnaire dated December 2, 2011 that Plaintiff suffered from "Panic, Post Traumatic Stress Disorder, Dissociative Fugue by history, Major depression [and] Features of OCD." [*Doc. 14-38* at 10]. He assigned Plaintiff a current Global

---

[7] These exhibits are found in *Doc. 14-33* at 2-43.

[8] It appears that Dr. Gucker obtained all of his information about Plaintiff's condition from his review of medical records, and did not examine Plaintiff himself. As such, the "great weight" given his opinions by the ALJ is somewhat perplexing, especially in light of his disregard of the opinions of the professionals who actually treated Plaintiff over extended periods.

Assessment of Functioning (hereinafter "GAF") score of 43,[9] and indicated that this was also his highest GAF of the past year. *Id*. Mr. Panaro identified the following "positive clinical findings" that supported his diagnosis of Plaintiff: poor memory; sleep disturbance; mood disturbance; recurrent panic attacks; feelings of guilt/worthlessness; difficulty thinking or concentrating; oddities of thought, perception, speech, or behavior; time or place disorientation; social withdrawal or isolation; blunt, flat or inappropriate affect; decreased energy; and obsessions or compulsions. *Id*. at 11. Mr. Panaro then indicated that every function listed was "markedly limited," and indicated that Plaintiff had experienced episodes of deterioration or decompensation in work or work-like settings that cause him to withdraw and/or experience exacerbation of his symptoms, that he was incapable of even low stress, was likely to have good and bad days, and was likely to be absent from work more than three times per month, "as a result of the impairments or treatment." *Id*. at 13-17. Mr. Panaro also stated his belief that "[Plaintiff] cannot sustain what is required in a work or work[-]like setting." *Id*. at 15.

The ALJ's boilerplate statement that "the contemporaneous psychiatric treatment notes, psychiatric reports, and other objective [evidence] do[] not confirm" the treating therapist's opinions regarding Plaintiff's symptoms, restrictions, limitations and their severity and intensity (*Doc. 14-3* at 40) simply does not satisfy the ALJ's duty to "*explain* the weight given to each [medical] source's opinions." *Hamlin*, 365 F.3d at 1215 (emphasis added) (citation omitted). If the numerous treatment notes provided by Life Link do contain information that conflicts with Mr. Panaro's assessment, the ALJ should have identified them and described the inconsistency.

---

[9] The GAF score is a measurement of the clinician's judgment of an individual's psychological, social and occupational functioning, and should not include impairment in functioning due to physical or environmental limitations. DSM-IV-TR at 32. A GAF score within the range of 41-50 indicates "[s]erious symptoms" such as "suicidal ideation, severe obsessional rituals, [or] frequent shoplifting," or "serious impairment in social occupational or school functioning (*e.g*., no friends, unable to keep a job)." *Id*. at 34.

Moreover, the mere fact that the opinions of other medical sources may conflict with Mr. Panaro's opinions is exactly why the ALJ is required to provide a narrative that details the differences and why he accepted one over another. The ALJ's "narrative" is, however, vague with respect to such matters and leaves this Court without the ability to effectively evaluate his decision.

### C. The ALJ's Findings Regarding Jobs Plaintiff Could Perform

Before relying on the VE's testimony regarding occupational information, an ALJ must "[i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided . . . and information in the Dictionary of Occupational Titles (DOT)." SSR 00-4p, 2000 WL 1898704; *see also Hackett v. Barnhart*, 395 F.3d 1168, 1175 (10th Cir. 2005) (the ALJ must "elicit a reasonable explanation" for discrepancy between VE evidence and the DOT). This is because, "[i]f the ALJ concludes that the claimant cannot perform any of his past work with his remaining RFC, the ALJ bears the burden at step five to show that there are jobs in the regional or national economies that the claimant can perform with the limitations the ALJ has found him to have." *Haddock v. Apfel*, 196 F.3d 1084, 1088 (10th Cir. 1999). Thus, an ALJ's duty to develop the record at all steps of the disability evaluation includes an obligation to question the VE regarding the source of her opinion and to explain any inconsistencies between it, the claimant's RFC, and the DOT. *Id*. at 1091.

Here, the VE testified, regarding the ALJ's "hypothetical man of 53 with a high school education currently limited to light work as defined by Social Security regulations, and is further limited to only occasionally crouching or kneeling or crawling, or using ramps or stairs or ladders or scaffolds, and further should avoid interaction with the public, should avoid concentrated hazards in the workplace," that such a man could not perform any of Plaintiff's past work, but could perform the work required by three other job types, which she identified as small parts

16

assembler (DOT 739.687-030), motel cleaner (DOT 323.687-014), and price marker (DOT. 209.587-034). [*Doc. 14-3* at 63-64]. The VE also testified that none of her evidence conflicted with DOT information. *Id.* at 64. In response to an inquiry by Plaintiff's representative, the VE also stated that none of the jobs she had identified would involve "more than minimal interaction with the public, coworkers, and supervisors." *Id.* at 64-65. Plaintiff asserts that the ALJ failed to inquire of the VE regarding conflicts between the specified jobs and his RFC. [Doc. 21 at 11-13]. Specifically, Plaintiff points out that the DOT description of motel cleaner indicates that such an employee "may render personal assistance to patrons," whereas Plaintiff's RFC, as stated by the ALJ, provides that, although Plaintiff can "adequately relate to and interact with co-workers and supervisors, [he] cannot interact with and relate[] to the general-public." [*Doc. 14-3* at 37-38]. Although the VE did indicate that such interaction would not be more than minimal, the DOT description appears to conflict with the "no-interaction-with-the-general-public" portion of Plaintiff's RFC, which discrepancy the ALJ did not address. As already stated, it is the ALJ's burden to discover and explain such discrepancies, not that of the Plaintiff.

Plaintiff also contends that, whereas his RFC allows him to "frequently" perform reaching as part of his employment, the DOT description of small parts assembler requires reaching activities "constantly."[10] [*Doc. 21* at 12]. This, also, is an apparent discrepancy that the ALJ failed to investigate and resolve, as his RFC determination precludes Plaintiff from working at an occupation that requires "constant" reaching.[11]

---

[10] With respect to "light work," the DOT defines the term "frequently" as engaging in an activity 1/3 to 2/3 of the time, whereas "constantly" requires engaging in the activity 2/3 or more of the time. *See* DOT 739.687-030, 1991 WL 680180 (describing occupation of Assembler, Small Products II).

[11] Plaintiff also notes that the small parts assembler job requires constant "fingering" and "handling" Continued...

17

## VI.   Conclusion

For the reasons stated above, the Court **FINDS** that the Commissioner's decision should be remanded for proper consideration of:  (1) the opinions of Dr. Gzaskow and Mr. Panaro with respect to Plaintiff's limitations, in compliance with applicable legal requirements; and (2) whether the VE's occupational evidence is consistent with the DOT information, as set forth above.

**IT IS THEREFORE ORDERED** that Plaintiff's *Motion to Reverse and Remand to Agency for Rehearing, With Supporting Memorandum (Doc. 21)* is **GRANTED** and this case is **REMANDED** to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order.  A final order will be entered concurrently with this Memorandum Opinion and Order.

**IT IS SO ORDERED.**

*Lourdes A. Martínez*
_____
**LOURDES A. MARTÍNEZ**
**UNITED STATES MAGISTRATE JUDGE**
**Presiding by Consent**

---

activities, and that the price marker job requires such activities frequently.  [*Doc  21.* at 12].  However, Plaintiff also concedes that the ALJ made no provision for fingering or handling in the RFC.  *Id.*  An ALJ cannot, and is not required to, list every activity that a claimant *can* do and, therefore, if a specific activity is not mentioned in the RFC, the Court may assume that such activity is not limited.  Since the ALJ did not restrict Plaintiff's ability to finger or handle in the RFC, the Court does not consider this to be a discrepancy that the ALJ failed to address.